P. E. MALLETTE

*v.*

MERCURY OUTBOARD SUPPLY COMPANY, INC. and
MARYLAND CASUALTY COMPANY.

*(Nashville,* December Term, 1958.)

Opinion filed January 23, 1959.
Rehearing denied March 12, 1959.

CLYDE P. WEST, Memphis, for plaintiff in error.

JOHN R. GILLILAND, WILLIAM G. BOONE, JR., Memphis, CANALE, GLANKLER, MONTEDONICO, BOONE & LOCH, Memphis, of counsel, for defendants in error.

MR. JUSTICE TOMLINSON delivered the opinion of the Court.

This is an appeal by Mr. Mallette from the judgment of the Trial Court disallowing Mallette's petition for an award under the Workmen Compensation Law, T.C.A. sec. 50-901 et seq. He was in the employ of the defendant,

Mercury Outboard Supply Company, as a night watchman at the time of receipt of injuries upon which he bases his claim. He is suffering a permanent partial disability of 75% to 80% of the body as a whole.

The employer, Mercury Outboard Supply Company, operates in McKellar Lake, connected with the Mississippi River at Memphis, under the name of McKellar Lake Marina. The physical layout is a group of buildings of undisclosed size constructed on a large barge anchored a short distance from the east bank of McKellar Lake. This concern sells gasoline to motor boats, other motor boat supplies, soft drinks, and rents space·for the·boat owners to dock and keep their boats.

The defendant's uncontradicted testimony is that on the night of November 18, 1957 he hurt his side in closing, pursuant to his duties, a sliding door at someplace on the barge. The Court, in discussing this evidence, found that ''I could find from the proof that the closing of that door could have caused some injuries, although the proof is very strong to the effect that it takes very little effort to close that door''. He worked on November 19 and 20.

There is a floating barge or ramp leading from the barge to the east bank of the lake. By means thereof is access to the barge. There the bluff rises from the lake with a steep grade. This incline is concreted, and from the water's edge there are steps which go to the top of the bluff. On November 20, while walking up these steps for the purpose of going home after his night's work had ended, he fell three steps from the top, having climbed 21 steps. As a result, he received serious injuries for which he was that day hospitalized.

The Trial Judge, after expressing the opinion that the injuries received in this accident were not compensable because it "happened off the premises", then said "granting, however, that the injuries received in this accident were compensable, then I have trouble with allocating the percentages with the injuries received from the three occurrences".

The third "occurrence" to which the Court was referring was an accident on December 8, 1957 while Mallette was convalescing in the hospital satisfactorily from the injuries received in the fall from the steps. The patient was being given a bath by a nurse. As to the manner of its occurrence the Court found that:

"It was not exactly an accident according to the proof. The proof is the Petitioner did not want to take a bath and the nurse insisted on giving him a bath and threw him around and twisted him around in such a way that he received this tortious injury, which in my opinion was not connected with any treatment or anything in reference to his stay in the hospital. It is a tort act of a third person."

The incident resulted in paralysis of petitioner which necessitated thereafter in the hospital two operations. He has not recovered, though some improvement has resulted.

In conclusion, the Trial Judge said that he was unable to determine what part of the disabilities was due to any one of the three occurrences

"and having ruled that the injuries received in the bathtub incident are not compensable, I am of the opinion that it would be a speculation or guess as to what

injuries were received in any one of the three incidents.''

First, it must be determined whether the injuries received in the fall from the steps are compensable. Next, whether the bathtub injury, was, or not, compensable.

■ As aforesaid, a floating ramp leads from the barge operated by defendant employer to the east bank of McKellar Lake. It is up this bank that the steps ascend to the top of the bluff. At that top commences an area for the parking of cars of patrons of defendant employer.

The east bank of McKellar Lake is a part of Riverside Park which is under the jurisdiction of the Memphis Park Commission. The employer operates its aforesaid business under a lease from this Commission. Mr. Cheairs was then manager of employer's business. His testimony is as follows:

"Q. I am referring to this walkway or ramp; is that a part of the premises? A. Yes. The walkway—to give you probably a clearer picture, the lease actually calls for a point south of the ramp, which is the boat loading place to Whiskey Chute. That is what the lease proper is. The parking area up on the land is a part of the lease. Then from there to the ramp, of course, and all the floating concessions and slips and boathouses, which some are owned by the company and some owned by individuals.''

\* \* \* \* \* \*

"Q. So your lease included your operations up on the bank and also the floating part of it on the lake? A. Yes, sir, one operation.

"Q. You rent from the Park Commission? A. Yes, sir."

The employer had operated the place since November 1, 1956. At that time the steps were not there. Cheairs testified at that time that defendant employer "did operate with the patron just getting up and down the bluff as best he could". He also added that prior to the erection of these steps "we had to make it as best we could up and down that bluff".

Mr. Cheairs' further testimony is that prior to the erection of these steps there was a rope there by the help of which descent and ascent to the water's edge was made. Then appears the following questions and answers:

"Q. And, of course, after you put the steps there the rope was moved? A. Yes, sir.

"Q. That was the only way, Mr. Cheairs, he could get down to your place except swinging by a rope which had been removed? A. Yes, sir."

Mr. Cheairs further testified that:

"A. We run up to the steps in order for the people to step from our ramp.

"Q. The steps lead to your property and nowhere else? A. That's right."

The conclusion is inescapable that (1) these steps were built as an incident to the operation of the business of defendant employer under the lease and for no other purpose, and (2) that the employees of the defendant could in reason use no other means of getting to and from their place of employment on the barge, and (3) were necessarily expected by employer to use these steps for

that purpose, and (4) the use of these steps was limited to the patrons and employees of defendant employer as distinguished from the general public. They were not used, nor hardly could be, except in furtherance of employer's business.

On principle, the foregoing admitted facts seem to force the conclusion, as a matter of law, that these steps were a part of the premises leased to defendants within the meaning of the Workmen's Compensation Law.

The exact physical situation here present, and from which this conclusion, on principle, is reached, does not appear to have arisen in any reported decision of this Court. But it has arisen in other jurisdictions and, in so far as this Court has found, every such case was decided in accord with the conclusion stated above.

When the Texas Supreme Court was faced with a parallel situation in *Lumberman's Reciprocal Association v. Behnken,* 112 Tex. 103, 246 S.W. 72, 74, 28 A.L.R. 1402, 1406, it held this:

"The crossing in this case here so intimate a relation to the lumber company's premises that it can hardly be treated otherwise than as a part of the premises. The lumber company had rights in and to the crossing. It seems to have had no other purpose than to further the company's business. It appears to have been used only in connection with that business, whether by employees or other persons. Hence the risk incurred by Behnken was one entirely foreign to all that portion of the public having no business on or about the lumber company's premises."

At page 396 of 50 A.L.R.2d there is an annotation reading as follows:

"The necessity of employees using a route across railroad tracks in order to go to or from their work was noted in *Ganassi v. Pittsburgh Coal Co.* (1948) 162 Pa.Super. 289, 57 A.2d 717, distinguished in *Kocher v. Lehigh Nav. Coal Co.* (1950) 167 Pa.Super. 236, 74 A.2d 499, *supra,* Sec. 5, in which a railroad siding used by a mining company at the entrance to its mine, together with a township road crossing thereon, was regarded by the court as the premises of the company, in so far as concerned compensation for an accident to an employee while crossing the tracks, and so to justify an award in favor of such miner under the circumstances present."

There is an annotation in 99 C.J.S. Workmen's Compensation sec. 231, p. 791, note 83, citing cases, for this holding, to-wit:

"* * * where employee must traverse property of employer or of employer's landlord to reach or leave work, such entrance or exit, whether or not located on property under control of employer, is part of employer's premises for compensation purposes."

Since this Court's conclusion is that the steps upon which this accident occurred must, as a matter of law, be regarded as a part of the premises of defendant employer within the meaning of the Workmen's Compensation Law, it follows that there is no evidence to support the Trial Judge's conclusion to the contrary. It may be parenthetically observed here that the language of the Trial Judge's opinion indicated that he had some doubt as to the accuracy of his contrary conclusion.

These steps were built by the City Park Commission. Their maintenance, if any, seems to be a responsibility of the Park Commission, according to defendant's uncontradicted evidence. It is insisted that this fact is an additional reason why the falling from the steps was an accident not coming within the Workmen's Compensation Law.

According to Mr. Cheairs, manager of defendant employer, the building of these steps by the Park Commission came about as follows:

"Q. Now, with reference to the steps, did the Mercury Outboard Supply Company have anything whatsoever to do with the building of those steps? A. No. There is a technicality there in our insurance. If we had built those steps then we would have assumed the liability for anything that happened on that bank, and that is the reason we operated so long without waiting for the Park Commission to put them in. If I had authorized those steps or built those steps, the company would have assumed the liability for them.

"Q. Then I guess your company did not have them built? A. Only hollered to have them built. We did not build them, no."

The lease was of no value without the steps, there being no other reasonable means of ingress and egress furnished. Their building by the City was insisted upon by defendant. It furnished no other means for its employees to enter or leave its barge where they were employed to work. Whatever may have been employer's arrangement as between it and the City, it could not by this arrangement relieve itself for whatever otherwise was its

responsibility and liability to its employees under the Workmen's Compensation Law by reason of the means afforded by it of ingress and egress to these employees.

To prevent persons from falling in going up or down those steps, holes had been drilled in those concrete steps some six to eight feet apart. And in each of these holes there was supposed to be an iron rod with an eye at the top through which there was supposed to run a chain to which persons going up or down those steps might hold, or catch. But this safety appliance was not there that day. It was frequently not there, and defendant employer knew of its frequent absence.

The recognition by defendant of the existence of some danger (as indeed there was) in going up or down those steps is necessarily implied in the testimony of employer's manager, Mr. Cheairs. He frankly stated that his employer waited "for the Park Commission to put them in" (and "hollered" for this Commission to build them) in order to avoid liability "for anything that happened on that bank".

As hereinbefore twice observed (because of its importance), the only means which defendant employer afforded petitioner to leave his place of employment and reach his home were these steps. So, as observed in *Lumberman's Reciprocal Association v. Behnken,* 112 Tex. 103, 246 S.W. 72, 74, 28 A.L.R. 1402, 1406:

"Under these facts, it is plain that Behnken's injury had to do with, and originated in, the business of his employer, since the conditions of the employment necessarily and constantly subjected him to special danger inseparable from the regular movement over the cross-

ing of railroad engines and cars, regardless of whether operated by his employer or by another."

In *Little v. Johnson City Foundry & Machine Co.*, 158 Tenn. 102, 106-107, 11 S.W.2d 690, 692, this Court held as follows:

" 'If the place at which the injury occurred is brought within the contract of employment, by the requirement of its use by the employee, so that he has no discretion or choice as to his mode or manner of coming to work, such place and its use seem logically to become elements or factors in the employment and the injury thus arises out of the employment and is incurred in the course thereof.' "

The validity of the rule is recognized as late as *Smith v. Camel Manufacturing Company*, 192 Tenn. 670, 674, 241 S.W.2d 771.

For the reasons stated the holding of this Court is that the injuries received by petitioner by the fall from the steps are compensable unless it be, as held by the Court, that "the injuries received in the bathtub incident are not compensable" and cannot be so separated from the disabilities occurring by reason of the previous injuries as to avoid, in the language of the Court, "speculation or guess as to what injuries were received" in the other two accidents.

It should be here noted that the fall from the steps injured anew or aggravated an already diseased back. This diseased back, as found by the Circuit Judge, prior to the first or second accident, had not interfered with the performance of the duties of this physically large and elderly petitioner, Mr. Mallette. He was placed in the hospital

for treatment of the injuries to his back thus received or aggravated in the second accident, to-wit, the fall from the steps.

The uncontradict testimony of the doctors is, to quote the language of Dr. Callison, "it is hard to say which of the three injuries that I have related is the more important". There is, therefore, substantial evidence to support the Trial Court's finding that it would be mere speculation as to what percent of the disabilities were received in the first and second accident as distinguished from the third, "the bathtub accident". If, therefore, the third is not compensable, the action of the Circuit Judge in dismissing the petition is necessarily correct. So now, it must be determined whether the bathtub injury is compensable.

It would hardly seem necessary to note that if the bathtub injury is otherwise compensable, it is not rendered non-compensable by reason of the fact that (1) it is an aggravation of a pre-existing disease or injury, *Cambria Coal Company v. Ault,* 166 Tenn. 567, 569, 64 SW2d 18, or (2) the tortious act of a third party. *Whaley v. Patent Button Company,* 184 Tenn. 700, 202 S.W.2d 649, and *Carmichael v. J. C. Mahan Motor Company,* 157 Tenn. 613, 11 S.W.2d 672.

The Trial Judge found that the bathtub injury, to quote the language of his opinion, "was not connected with any treatment or anything in reference to his stay in the hospital. It is a tort act of a third person". He based this finding upon a statement of petitioner's wife to the hospital manager that in the course of being given a bath at the hospital "the orderly jerked the patient in

such a manner that Mr. Mallette became totally paralyzed from the waist down to and through his feet''.

Mr. Mallette was placed in the hospital for treatment of a compensable injury, to-wit, an injury to his back occasioned by the fall from the steps. During the course of such treatment, and as an incident thereof, while being given a bath by a hospital orderly his back injury was considerably aggravated by the orderly's negligence.

In *Revell v. McCaughan,* 162 Tenn. 532, 39 S.W.2d 269, an employee received a compensable injury which was aggravated by the malpractice of the attending physician. It was there held (162 Tenn. at page 538, 39 S.W.2d at page 271) that the compensable ''original injury is regarded as the proximate cause of the damage flowing from the subsequent negligent treatment by the physician''. By analogy, this holding in that case requires in the case at bar a holding that the fall from the steps must be regarded as the proximate cause of the damage flowing from the subsequent negligent act of the orderly in giving a bath to Mr. Mallette. The bath was an incident to the treatment for which Mr. Mallette had been placed in the hospital.

In the New Jersey case of *Flanagan v. Charles E. Green & Son,* 122 N.J.L. 424, 5 A.2d 742, and annotated in 127 A.L.R. 1113, the employee was placed in the hospital for treatment of a broken leg received in the course of his employment. His arm was injured in the changing of the bed sheets by the hospital nurse. This arm injury was held to be compensable, the Court holding in the language of the A.L.R. annotation:

''* * * that the changing of the sheets was so incidental a part of the adequate hospitalization as to be

routine in every hospital, and that the arm injury was so incidental to the medical and surgical treatment afforded by the employer as to constitute an injury arising out of and in the course of the employment within the meaning of the Compensation Act.''

In the opinion of this Court, it must be concluded, as a matter of law, that the injury received in the bathtub incident was one arising out of and in the course of Mr. Mallette's employment within the meaning of the Compensation Law; hence compensable, and that the Trial Judge was mistaken in concluding that such injury "was not connected with any treatment or anything in reference to his stay in the hospital''.

It results that petitioner is entitled to compensation under the statute for the condition in which he was left after the bathtub injury was received.

The judgement of the Circuit Court to the contrary will be reversed with the costs of the appeal taxed against defendants-in-error. The cause will be remanded for such further proceedings in accordance herewith as are necessary.