**Elizabeth HANKINS, Appellant,**

v.

**CAMEL MANUFACTURING COMPANY and
Aetna Casualty and Surety Company,
Appellees.**

Supreme Court of Tennessee.

Jan. 2, 1973.

Rehearing Denied April 2, 1973.

W. E. Fitzgerald, W. Conway Garlington, Knoxville, for appellant.

Jerry A. Farmer, Knoxville, for appellees.

## OPINION

JOHN W. WILSON, Special Justice.

This compensation case comes on appeal from the action of the Circuit Court of Knox County dismissing the petition for compensation filed against Camel Manufacturing Company and their insurance carrier, Aetna Casualty & Surety Company.

For convenience, the parties hereinafter will be referred to as employee and employer. The employee, forty years of age, had worked for the employer Camel Manufacturing Company for about eleven years, as a sewing machine operator. The employer's place of business was in a building located at 329 South Central Avenue, Knoxville. The employer was the sole occupant of the building, which had three means of ingress and egress, front, side, and rear or alley. The offices of the employer were located on the first floor. Access to the third floor was by means of two elevators and the stairway. The clock used for employee to clock in and out was located on the first floor. At 9:00 A.M. and at 2:00 P.M. there was a rest period of ten minutes. There was a lunch period of thirty minutes, for which period the employees were not paid. The time for this lunch period was at 11:30 A.M., the beginning and ending of which was announced by the ringing of a bell. When the beginning of the lunch period was announced, a number of the employees would go to a lunch wagon parked in the alley to the rear of employer's building and, in going to this lunch wagon to purchase hot lunches, they

would use, as a means of egress from the building, a door opening into the alley from employer's building.

On February 3, 1971, when the bell rang for the lunch break, the employee left the third floor, where she worked, rode one of the two elevators to the first floor, then proceeded to the door of the building opening onto the alley, intending to purchase food from the vending truck and to return to eat lunch at her machine. The employee's testimony is that, as she started through the door, she slipped on a concrete slab which had an accumulation of ice on it, causing her to fall out into the alley. After she fell, she was carried back into the mill and sent to the company doctor, who, in turn, referred her to Dr. Vernon Young, an orthopedic surgeon, who admitted her to Fort Sanders Hospital, where her injury was diagnosed as a comminuted fracture of the right wrist and an open reduction and fixation with screw was performed at the fracture site.

Mr. T. P. Lawson, Vice President of employer, testified that he did not see employee fall but arrived as she was being picked up. It further appears from the testimony of Mr. Lawson that the employees were not forbidden to use any of the three entrances to the building; that the company uses a building across the alleyway and workmen and material cross back and forth over the alley between the two buildings and through the doorway where employee fell. Mr. Lawson further testified that where the employee says she fell was on the employer's property and that the employer kept calcium fluoride at this back door during bad weather to apply at the doorway and alley when there was icing condition to aid their employees entering and exiting through the door. That on this particular morning it had been sleeting off and on and the door area had been salted earlier that morning. That, in addition to salt, sand was used in the alley because a drain in the alley causes water to collect.

Two employees of the employer testified on behalf of the employer. Witness Akins stated that he arrived after employee fell and helped pick her up. Witness Reed testified that he was walking out of the building at the same time the employee Hankins was, but did not see her slip, initially, but saw her sliding in the alley.

Mr. Lawson further testified that the employer had no connection with the lunch wagon, did not direct its employees on where to take lunch, nor what exits from the building its employees were to use in going to lunch.

In rebuttal, the employee testified that there were no white particles on the doorstep on the day she fell. It further appears that the employee had, at times, been sent from the building where she regularly worked to the building across the alley, to work, and, at which time, she used the door exiting on the alley.

The only assignment of error is that the learned trial judge erred in holding that the employee's accidental injury did not arise out of and in the course of her employment.

We note in a memorandum opinion filed by the trial court that he stated there were three doors to the public alley at the rear of the building. This is an inadvertence for there is no dispute about there being three entrances to the building, front, side and back, and there is no testimony that all entrances were from the alley. We note from the trial court's memorandum filed, as follows:

"The Court does not make a finding of fact that the fall occurred on the premises or off because that is not necessary in deciding this case. Actually falling on the premises of an employer is not determinative. Travelers Ind. Company v. Charvis [221 Tenn. 593], 428 S.W.2d 797.

. . . . . .

Can it be said petitioner was injured by an accident arising out of and in the

course of her employment. She was not at her duty station working, so there cannot be an injury arising out of and in the course of her employment unless there are exceptions which are applicable.

(The phrase) in the course of, refers to time and place, and arising out of, to cause or origin; an injury by accident to an employee is, in the course of employment if it occurred while he was performing a duty he was employed to do; and it is an injury 'arising out of employment if caused by a hazard incident to such employment.' Shubert v. Steelman, 214 Tenn. 102, 377 S.W.2d 940. See also Travelers Ins. Co. v. Evans [221 Tenn. 199], 425 S.W.2d 611.

There are exceptions to this general proposition of law when an employee is injured going to and from his work. Though no cases are cited, the Court feels that the same law applies to a lunch break going to have lunch or returning from lunch.

That law is as follows:

'Injury by accident arising out of and in the course of employment means in so far as the compensability of the activities of the employee in going to and returning from work is concerned, that if the process of going to and from is furnished by the employer, or is required by the employer to be done in a certain manner or over a certain way, and this submits the employee to a definite special hazard, then in such event such accidents are compensable . . .' Smith v. Camel Mfg. Co. [192 Tenn. 670], 241 S.W.2d 771, at 774–5.

Does the petitioner come under this exception?

The Court feels not. She was not required to follow any one route leaving the building. Actually, there were three exits and she had an option." Bill of Exceptions, pp. 13–14.

As quoted above, the trial court refers to the quoted language in Smith v. Camel Manufacturing Company (1951) 192 Tenn. 670, 241 S.W.2d 771. We note also the employee relies on Smith v. Camel Manufacturing Company, supra, as follows:

"It is apparent from the foregoing quotation that this Court has rejected the general statement that an accident suffered by an employee in going to and coming from work was compensable if it occurred on the employer's premises or so near the place of employment as reasonably would be regarded as in effect at the place, unless there was some special considerations as the requirement of use of a special road or way, or if the manner of travel or the way of travel was within the contemplation of the contract of employment." Employee's Brief, p. 8.

It is also noted the employer relies on Smith v. Camel Manufacturing Company, supra, as follows:

" . . . It seems to us and we hold that under the language of our Statute, Code Section 6852, (T.C.A. § 50–902) that the terms 'injury by accident arising out of and in the course of employment' means in so far as the compensability of the activities of the employee in going to and returning from work is concerned, that if a process of going to and from work is furnished by the employer, or is required by the employer to be done in a certain manner or over a certain way, and this submits the employee to a definite special hazard, then in such event such accidents are compensable, the employee is not to be considered in the course of his employment until he has actually arrived at his place of employment ready to begin his activities in the employer's work unless those qualifications last above said are applicable." 241 S.W.2d 771, at 774–775.

In Smith v. Camel, supra, the employee fell on the public sidewalk 6 to 20 feet

from the entrance to the building where she worked. We have examined a number of other cases called to our attention, including James v. Sanders Mfg. Co. (1958) 203 Tenn. 274, 310 S.W.2d 466; Bennett v. Vanderbilt University (1955) 198 Tenn. 1, 277 S.W.2d 386; Mallette v. Mercury Outboard Supply Co. (1959) 204 Tenn. 438, 321 S.W.2d 816; Travelers Indemnity Company v. Charvis (1968) 221 Tenn. 593, 428 S.W.2d 797, and Potts v. Heil-Quaker Corporation (1972) Tenn., 482 S.W.2d 135. All of the mentioned cases are in the light of facts where the employee is using a public way and has not reached the place of employment, has left the place of employment and is again on a public way, or parking lot, or the use of a required route.

After careful examination of all the authorities mentioned above, we have reached the conclusion that the law announced in those cases does not provide the answer to the question presented in the case now under consideration.

In the case under consideration the employee started working at 7:00 A.M. and was injured during the thirty-minute lunch break en route to the truck in the alley when she slipped on a slab at the door, which had ice on it. She does not contend that the employer owned this truck or had any financial interest in the income from the truck.

On re-cross examination, we note this:

"Q. That little lunch wagon, that is not something that Camel Manufacturing Company owns or has there so far as you know?

A. No, but, see, when that wagon started coming there they told us that we could get hot sandwiches and things off of it. The floor lady told us that there was a wagon coming out there and we could get hot coffee, sandwiches, anything we wanted off of it.

Q. But if is not operated by the company? It is not a company store or canteen or anything like that?

A. No."

The fact that the employer does not have any financial interest in the lunch wagon may be immaterial in the search for the ultimate answer to the question presented. We do observe, at this time, when you consider the wording of the Question and the Answer made thereto immediately above, that the statement when she in the Answer said, "they told us" and "The floor lady told us" referred to the employer or its representatives. The answer of the witness, as set out above, is not denied.

From the employer Mr. Lawson's examination, we note this:

"Q. Do you remember whether or not on this particular day there was a little lunch wagon out there?

A. Yes, the lunch wagon usually sets in this little cove area. If we cooperate with them at all—we can't tell them what to do but we do tell them if we cooperate and all we must have the alley open. We are required by the city to keep the alley open as much as possible, but we always insist that they set in this location as close as they can.

.    .    .    .    .    .

Q. Are they here this morning?

A. Yes, sir.

Oh, I knew all the people who were there, but to know their names, I could not remember. I could have when I was looking at them, but I can't remember. There's about a hundred and twenty people work in those two buildings and they have all access to the lunch wagon if they want to.

.    .    .    .    .    .

Q. In fact, Mr. Lawson, on many occasions that truck has pulled right

up close to the building and raised the side where the employee could just step right out and get food and step back in if it is snowing or heavy rain or something?

A. We ask him—if we see it we ask him not to pull too close. We consider the public. We feel like they should have one traffic lane through there. We couldn't make him do it, but we—if he wants the cooperation of our people, I think he understands."

We again refer to Mr. Lawson's testimony:

"Q. You say that this little step here where you have put an 'X' here, that is on your property.

A. Correct.

Q. And that is the same 'X' as shown in Exhibit No. 1, and I will show it to you.

A. Correct.

Q. Now that is your property?

A. That's right."

Examination of Exhibit 1 shows the "X" mark to be placed on a concrete slab or step obviously in the doorway entering onto the alley.

Continuing to quote from the testimony of Mr. Lawson:

"Q. And you say that you have on occasion put what out there?

A. We keep calcium chloride sitting in the back door all through the bad weather, and we salt—they call it salt—to relieve the ice.

Q. To help your employees come in and out there?

A. Yes, that is—Well, we use sand in the alley mostly. We put some calcium chloride, but we use sand in

bad weather so the trucks can negotiate the grade there.

.    .    .    .    .    .

Q. In other words, it would cold rain for periods of time and then stop?

A. But by that time of the morning I feel sure that all the ice was off of the sidewalk and in the doorway. There was some ice. When I went out and watched them pick her up, there was a streak of ice, maybe two or three feet, right in the center of the alley.

.    .    .    .    .    .

Q. What does it look like?

A. It is a white granular, about like heavy salt like the ice cream—what we used to call ice cream salt.

Q. And you are saying that February 3rd, 1971, that those white granular were all over that slab there we are talking about?

A. We use it on the sidewalk and the driveway. We don't always have to use it in the alley. We use sand as much as possible because it is pretty expensive. Of course, we have used it in the alley too.

Q. Mr. Lawson, on February 3rd, 1971, you are saying that that white granular material was on the slab?

A. Correct.

Q. Before 11:30?

A. Yes.

Q. And it was there because of an icy condition?

A. Yes.

Q. Mr. Lawson, you do not prohibit your employees from eating near their work areas?

A. No.

Q. In fact, most of them bring their lunch and buy their lunch and go in the building near their work area and eat their lunch?

A. I don't know what percentage but a lot of them do, and I think they stagger. Some time for awhile I think they bring their lunch, and sometimes they go to the lunch wagon. We have some that go up to Gay Street and eat at a little restaurant up there.

Q. Would you say that the vast majority of them eat on the premises?

A. I'd say they do, most of them.

Q. And that has been a practice that has been going on for years, I take it?

A. Yes."

In Johnson Coffee Co. v. McDonald (1920) 143 Tenn. 505, 226 S.W. 215, the case involved a claim under the Tennessee Workmen's Compensation Act for the death of an employee. In that case, it appears that the employer allowed the employees to eat their lunch on the lunch hour on the premises and the decedent had left the building in which she was employed, crossed the street, procured some lunch, and was going to the third floor of the building where she worked to eat lunch, when the elevator which she was using to the third floor did not stop and she became excited and attempted to get off the elevator, falling down the shaft, causing her death.

"The Court on page 10 of the opinion stated:

'As to the first point, the cases arising under workmen's compensation laws are practically unanimous in holding that injuries received by employees while in the act of leaving, or preparing to leave, the place of employment to get lunch or refreshment, or while eating lunches on the premises, as allowed by the employer, arise out of and in the course of employment.''

The later case of Kingsport Silk Mills v. Cox (1930) 161 Tenn. 470, 33 S.W.2d 90, although involving a different set of facts, seems to approve the principle of the *Johnson Coffee Company* case, supra. In the *Kingsport Silk Mills* case, an employee of the company fell just after the lunch recess in the main building while watching a basketball game of other employees on the court—being played by permission of and encouraged by the employer as a means of recreation for the employees during such noon hour of thirty five minutes. The court, in approving a compensable award, stated on page 473 from Bradbury, Workmen's Compensation (3 Ed.) 524:

" 'The relation of master and servant, in so far as it involves the obligation of master to protect the servant, is not suspended during the noon hour, where the master expressly, or by fair implication, invites his servants to remain on the premises in the immediate vicinity of the work.' "

The *Johnson Coffee Company* case, supra, has been cited in the following cases: Tennessee Chemical Co. v. Smith (1921) 145 Tenn. 532, at p. 537, 238 S.W. 97; Little v. Johnson City F. & M. Co. (1928) 158 Tenn. 102, 11 S.W.2d 690, and Free v. Ind. Ins. Co. of N. America (1940) 177 Tenn. 287, at p. 291, 145 S.W.2d 1026.

The trial judge, in his memorandum filed, states that actually falling on the premises of an employer is not determinative, citing Travelers Ind. Co. v. Charvis (1968) 221 Tenn. 593, 428 S.W.2d 797. It is noted that in the *Charvis* case just mentioned, the Court cites as authority for the statement Bennett v. Vanderbilt University, supra, and in the text of the opinion the words "or property" follows the word "premises". Bennett v. Vanderbilt, supra, makes the distinction between property and premises. The injury involved in Bennett v. Vanderbilt occurred on a parking lot

some distance from the building in which the employee was injured.

Much emphasis has been placed upon the fact that the employer did not require the employees to use any one of the three exits from the building in going to lunch—that they had their choice of routes.

We are of the opinion that the Choice of Routes rule announced in Smith v. Camel Manufacturing Company, supra, where the employee is on a public sidewalk on her way to the *building* in which the work is to be performed, or has left that *building* at the end of the day's work, and again on the sidewalk or a parking lot, has no application to the situation of this employee and numerous other employees leaving the building where the work is being performed and is injured on one of the exits for the purpose of obtaining lunch. This employee had been working since 7:00 A. M. on the third floor of a large building, the access to which floor was by two elevators and a stairway. She was expected to eat lunch and, assuming she elected to use the stairway and fell and was injured, would it be reasonable to say that she had her choice of routes, which would be the same as saying, "You should have used the elevator". While it is true the employer did not require the employee to use any one of the exits, we do not think that is material to a determination of the issues.

While Johnson Coffee Company v. Mc-Donald, supra, is one of our oldest causes, our attention has not been called to any case overruling it, nor have we been able to find one.

As we have stated hereinbefore, the employer had no financial interest in this lunch wagon, but it could have, and we think it did, have an interest other than financial, which is none other than the general welfare of the employees. From the transcript above quoted from, it was the management which first called the attention to the employees that the truck would be in the alley at lunch time and that they could get hot food and coffee. It was Mr. Lawson who makes plain that all he wanted the truck owner to do was cooperate. He knew a great number of the employees used the lunch wagon and had for a long time—at one place he states, "All 120 of the employees had access to the truck." He salted the exit through the door which the employee was required to use to get to the truck, to protect them. The testimony of the employee, as quoted above, could reasonably be construed as an expressed invitation to use the door for the purpose of getting to the truck and, in any event, there was an implied invitation arising by long custom, full knowledge of the employer and positive action on his part to protect the employee.

It is not material to the issue presented herein but we make the comment under the facts of this case, that if this employee was not covered by the compensation law, she has lost in attempting to assert her rights under the Act what, on first impression, seems to be a good common law action.

█ If she was injured at the place she says she slipped and fell, we are of the opinion that the employee's accident arose out of and in the course of the employment.

So there must be a determination of fact made as to whether the employee fell at the place she testified she slipped and fell or whether she slipped and fell as the employer insists, after she had passed through the door and entered into the alley. If her testimony on that issue is not contradicted, then this Court, from the proof in the record, can make an award of compensation. So an examination of the testimony is required.

EXAMINATION OF EMPLOYEE (Direct):

"Q. Now on February 3rd, just tell His Honor what you did after you came down from the third floor at 11:30, coming to the first floor.

A. Well, I come down on the back elevator and got out off on the first floor and started through the door, and when I hit that slab there at the door there was ice on it and I slipped down on it."

. . . . . .

"Q. Was that before you got out to the sidewalk or alley area when you slipped?

A. Yes, sir."

. . . . . .

"Q. All right. After you slipped where did you end up, or just tell us what happened.

A. When I slipped and fell, why, I slid just a little out in towards the alley."

EXAMINATION OF EMPLOYEE (Cross):

"Q. And then you passed through this door?

A. Well, when I started through the door I slipped on that slab there on this ice and I fell down."

EXAMINATION OF EMPLOYEE (Re-Direct):

"Q. Now, Mrs. Hankins, one last question. You had not gotten out to the public driveway or the alley sidewalk when you slipped?

A. No, sir."

EXAMINATION OF LUTHER AKINS, for the employer (Direct):

"Q. Were you present when she fell?

A. No, I wasn't.

Q. Were you present at any time after she fell?

A. Yeah, I helped pick her up out of the alley.

Q. Mr. Akins, I show you a picture marked Exhibit No. 7 and ask you if that reflects the rear entrance to Camel Manufacturing Company?

A. Yes, it does.

Q. On that photograph, sir, can you mark the spot where you helped pick Mrs. Hankins up?

THE COURT:

Let him circle that so that it will show a different—

Q. Circle that.

(Witness did as instructed)

Q. Now on this particular occasion was there a lunch wagon out there?

A. Yes, there was.

Q. And can you put—just put a 'L', if you would, sir, where the lunch wagon was."

EXAMINATION OF LUTHER AKINS, for the employer (Cross):

"Q. All right. Now you have marked an area there in the area where she was lying when—She was stopped when you saw her?

A. Yes, she was.

Q. Now actually that was down a little from the entrance to the doorway? It wasn't straight out in front of the door?

A. It was between the truck and the building.

Q. This is downgrade, isn't it, going south?

A. Yes, sir, it is."

EXAMINATION OF LUTHER AKINS, for the employer (Re-Direct):

"Q. Everybody else has been asking you a bunch of distances. I will ask you one too.

A. Okay.

Q. How far was it between the doorway and where Mrs. Hankins was lying when you saw her?

THE WITNESS: From the doorway?

MR. FARMER: Yes, sir.

A. I'd say it was about six foot.

Q. And how far from her to the lunch wagon?

A. She was about four foot from the lunch wagon."

EXAMINATION OF ALLEN LEE REED, for the employer (Direct):

"Q. Were you present when Mrs. Hankins fell down?

A. I was walking by the side of her.

Q. And where was it that the two of you were walking when she fell down?

A. Just right after she come out of the door—I don't know whether she got straightened up or not—she stepped on solid ice and here she went."

"Q. Where were you when she actually fell?

A. I was standing between her and the lunch wagon truck by the side of the truck."

EXAMINATION OF ALLEN LEE REED, for the employer (Cross):

"Q. Now as you came through the door, you were going to the lunch wagon?

A. Yes, sir.

Q. And you both didn't go through the door at the same time, or did you?

A. I doubt that. There's just about room enough for about one at a time to get through it. Whether she was walking close to me or not,

I don't know, but I know she passed me a-sliding.

Q. All right. Now that is what I wanted to ask you. In other words, you had gotten through the door?

A. Yes, sir, and I had come on out. I walked straight across the walkway on out into the street.

Q. And the first thing that you knew something was happening was she was coming by you sliding?

A. She passed me a-sliding, yes, sir."

·    ·    ·    ·    ·    ·

"Q. You didn't actually see her first slip, did you?

A. No, sir, only when she passed me."

From an examination of the exhibits it is disclosed that there is a narrow walkway along the side of the alley which passes the entrance doorway of employer's business. It is noted that witness Allen Lee Reed testified he had walked straight across the walkway and she came by him sliding and that he did not see her slip. The witness Akins did not see her slip. The surface of the alley was described as downgrade by the witness Akins and the witness Reed said she came sliding by him. The employee says she slid into the alley a little ways after slipping on the slab in the doorway. Considering the physical condition of the alley and what the witness Akins said about it being downgrade and that she passed the witness Reed sliding, where her body came to rest in the alley cannot be said to be in contradiction of her testimony as to where she slipped. We are of the opinion that the testimony of the employee is not contradicted and we are of the opinion that the injury sustained by the employee arose out of and in the course of her employment.

The exhibit to the doctor's testimony disclosed the medical and hospital expenses sustained by the employee. We refer, as

follows, to the deposition of Dr. Vernon H. Young:

"Q. Doctor, when in your medical opinion did this lady reach her maximum recovery?

A. It is very difficult to tell really in that I think probably she still is probably showing some or is having some symptoms referable to her wrist, and we know from having previous patients with similar type injuries that very often it takes a matter of months for this type of injury to resolve and improve, and usually we usually prefer for them to get their fracture healed and get their motion back and return to their work if at all possible, and then we usually don't like to even consider them reaching maximum improvement until they have been back to work, and after a period of several months, we would probably see them in the neighborhood of nine months to a year after injury to check them for their final visit. She is approaching nine or ten months now. We probably would not anticipate her having much more improvement than she presently has. It is possible but not very likely. Her motion I think is quite good. Her biggest problem right now is pain. Usually you have a problem with these people getting their motion back with associated pain, but her motion is quite good but her pain is still a problem for her.

Q. And in that light then, Doctor, do you expect some possible improvement on the thirty to thirty-five percent disability?

A. In this lady's particular situation I thought I was being probably liberal in rating her at thirty to thirty-five because I felt like in view of her being rather anxious about her inability to return to work and her wrist still hurting her and everything, that it would be unfair for me to not take into account the fact that she might possibly have an operation in the future, and so I included the possibility of another operation and hospitalization in the disability rating so that if she could get her claim settled, then after everything was settled if she is still having some symptoms for surgery, we could carry it out in a more stable situation."

The employee, upon suggestion of her doctor, tried to return to employment for light work but the employer informed her that there was no work that she could do.

Upon considering the testimony of Dr. Young, in its entirety, and particularly the part quoted, we are of the opinion that the trial court is the proper tribunal to make the award of compensation.

The judgment of the trial court is reversed and the cause remanded with direction to the trial court to fix the amount of compensation to which the employee is entitled, hearing such other additional testimony as he deems fit.

The costs accrued will be assessed against the employer.

DYER, C. J., and CHATTIN, HUMPHREYS and McCANLESS, JJ., concur.

## OPINION ON PETITION TO REHEAR

JOHN W. WILSON, Special Judge.

The appellees, Camel Manufacturing Company and Aetna Casualty & Surety Company, have respectively filed a petition to rehear.

If we correctly understand, the appellees' counsel seems to think we overlooked the case of Drinnon v. Knox Mfg. Co., Tenn., 481 S.W.2d 380. This case was not overlooked and, at the time the opinion in the instant case was prepared, we had before

us the Southwestern Advance Sheet, as well as a copy of the opinion prepared by Mr. Justice Chattin, who wrote the opinion in the *Drinnon* case.

In the instant case, we discussed at length the facts of the case and there is no conflict with the holding in the *Drinnon* case.

The petition to rehear is respectfully denied.

DYER, C. J., and CHATTIN, HUMPHREYS and McCANLESS, JJ., concur.